Your argument in our first case, Ms. Duffley? May it please the Court, my name is Kim Duffley, and I represent the North Carolina Utilities Commission, which I'll refer to today as the NCUC, or North Carolina. You might want to lean in just a little bit, speak into your mic. Very good. Thank you. This appeal arises from FERC granting VETCO transmission rate incentives for 11 transmission projects, five of which North Carolina appeals. In 2005, based upon a perceived lack of investment in transmission infrastructure, Congress passed Section 219 of the Federal Power Act, requiring FERC to pass rules to provide incentives for investment in transmission infrastructure and economically efficient transmission infrastructure. In 2006, FERC passed Rule 679, and it authorized transmission incentives as long as the applicant could meet a three-part test. First it had to meet the requirements of Section 219, and then the applicant had to show that the requested incentives, that there was a nexus between the requested incentives and the transmission project at issue. Could I ask a question about your argument about the nexus requirement? Yes. I understand your concern that FERC subsequently appeared to change its nexus requirement to look at the viability of projects individually rather than in the aggregate. That's the gist of your concern? Correct. But I'm a little unclear why you feel prejudiced by that since, as I recall, in its 2008 incentives order, didn't FERC hold that Dominion Resources had met the nexus requirement both as a package and for each individualized project? So in other words, why would NCUC feel aggrieved by the change when it appears from the incentive order that the FERC actually looked at the projects on an individualized basis? Correct, Your Honor. The 2008 order does state that FERC looked at, applied the nexus test individually to each project. However, North Carolina believes that this is not, in fact, what FERC, it did apply that project on, or the nexus test on an individual basis. And the reason- So it said that it did? Yes, Your Honor, because in the 2012 order denying rehearing, in paragraph 11 of that might be a different result. It said it may well have been, which is, yeah, was an odd- Correct, Your Honor. And so, in essence, FERC was stating in the 2012 order that it had really not fully applied the nexus test individually to these projects. Also, in VEPCO's request for incentive rates, and it's record page 19 of the record, VEPCO states the amount of incentive treatment. So it asks for a 1.25 percent increase in the ROE. They state this warranted by the major capital expansion program that these projects entail in the aggregate. So the level of the incentive that was given is in error as well, because VEPCO requested in its incentive application the amount not being a 0.5 percent increase in the ROE, but asked for a higher level of ROE based upon looking at all of these small projects in the aggregate. It sounds, though, as though your argument isn't so much that the FERC didn't apply the nexus test on an individualized basis, as you would have preferred, but that it did not do so, in your view, correctly. Correct, Your Honor. That is correct. There's two-fold argument. First that it did not retroactively apply the rule clarification, and thus it erred from the fact that since it did not apply this rule clarification during its rehearing, the 2012 order rehearing, that it failed to meet that manifest injustice test. And that's an error within itself. FERC made it clear that it didn't intend to apply this law retroactively, that, in fact, when it was brought about in 2010, intent was that it would be prospective. You maintain that it, nonetheless, should be applied retroactively, and tell me what authority are you relying on that requires the FERC to apply a policy change retroactively when it says, in fact, it chooses not to do so? Yes, Your Honor. Actually, this was a rule clarification versus a policy change because the rule clarification occurred in a FERC adjudication versus a rulemaking proceeding or a rulemaking docket, and the courts have held an ARA services, which this court looked at this issue. Let me make sure I understand what you mean by clarification. Clarification means nothing really changes. They are just making it clear what they already intended to do. It seems to me obvious from the initial policy that it applied in aggregate, not individually. It's not a clarification to come back and say, now this must be individually done when earlier the policy was that you could do it in aggregate. Your Honor, North Carolina respectfully disagrees. In the PJM case in paragraph 44, as well as in the Oklahoma case in paragraph, I believe, 35, both of those cases FERC stated that the application of the nexus test was unclear. The purpose of those two cases was to clarify the nexus test. In the PJM case and the Oklahoma gas case, the FERC stated that sometimes they applied when there were multiple projects in one application, that sometimes FERC would apply the nexus test on an aggregated basis to all of the projects, whether they were related or not, and then other times the FERC would apply the nexus test to each individual project. So there was no clear policy in place at the time PJM, the PJM case, and the Oklahoma gas case were decided. So that is why it is a rule clarification versus a policy change. Assuming that FERC should not have changed midstream, which I take to be your point, why would its rationale that to apply the rule retroactively would cause confusion and uncertainty and prejudice, which had reasonably relied on the structure that was set out, why is that not sufficient to meet FERC's burden to explain why it was going to apply its views prospectively only? Thank you, Your Honor. Because there is no unfairness to VEPCO, the reason being is that VEPCO was moving forward with all five of these projects, irrespective of whether VEPCO was granted incentives or not. And within the record, VEPCO even argues in its answers, and its record page 738 on that page, VEPCO states that it was moving forward with the proactive transformer replacement project, whether it received incentives or not, and the fact that they were moving forward with these projects did not matter as to the granting of incentives. All five of them? I know with respect to the proactive transformers, but it was already moving forward with all five of them? Well, on record pages 756 and 871, they stated they were moving forward with the Idlewood project, and then on record page 869, they stated they were moving forward with the Lexington project. But also, in VEPCO's application for incentives, looking at records pages 241, 248, 261, 267, and 234, these are the project status pages within the application, and looking at the on the record that VEPCO was moving forward with all of these projects. For example, with the Garrisonville project and the Pleasant View project, they had spent $10 million already on one project and $6 million already on the other project, and those are the two projects on which they had not admitted in their pleadings that they were moving forward with irrespective of the incentives. Is it required that incentives be given only with respect to threshold projects, as long as they meet the criteria of contributing to the reduction of congestion, et cetera? The purpose behind Order 679 was not to apply incentives to all transmission projects. Otherwise, it would be unfair to rate payers to pay more for transmission infrastructure than is necessary. This is the reason for the criteria set, and the projects that were most likely to receive incentives or should receive incentives are large projects, like the Northeast Utilities project that cost $1.2 billion, and projects that span several states, not routine projects, the five projects that North Carolina is objecting to today. Let me move you, I just want to make sure I get a clarification to use your word of how you use that word clarification. You say this is a clarification policy. The commission called it an evolving policy. The Panhandle case calls it a modification of a policy, for which you say if there's a substantive change in the law, then you may have to apply it retroactively. But my understanding of your characterization is, as a clarification is, it always was the law. And if it always was the law, you don't need retroactive. It's always the law. It's just saying that's what the law was anyway. So you don't need this change. You're saying if you had interpreted the first one correctly, then this is what it would be. Is that what you're saying? Correct, Your Honor. But you don't need a retroactive application. You don't need a prospective application from your view, because you're saying that's what the first policy was. The commission takes a different stance. It says it's actually changed. That's why it said in that language that you quoted, if we were applying this policy now, we might come out with something different. You don't come out with something different if it's a clarification. True? Correct. So explain this clarification thing you're talking about. We're talking about two different things here, aren't we? Well, Your Honor, I agree with what you have stated, and that's why North Carolina is I don't understand you agreeing with what I stated when you say this is a clarification. And I'm stating that it can't be a clarification in the view of the commission if, in fact, they say it's an evolving policy. And when you look at the Panahan Penal case from the D.C. Circuit, I don't know to the extent that that's controlling, but the D.C. Circuit kind of do agency stuff. But they say it's a modification of policy for which if it's a substantive change in the law, then you go back and do the retroactive. You sort of take the discretion away from the commission. But piggybacking on Judge Duncan's line of questioning here, I just don't see how you're getting that they are required to apply this retroactively if it's made the discretionary decision to say we'll go forward with this, and it gave reasons for going forward with it. It listed three solid reasons as to why they don't want to go back and make this change. I mean, there's a lot invested in it from BEPCO's perspective and a couple other reasons. So how do you get there? Because that's fundamental from my perspective as to how you're going to even get off of that to say that this is just a clarification. Well, Your Honor, FERC stated in both the PJM case and the Oklahoma gas case that FERC itself was applying the nexus policy in two different ways when dealing with applications that contained multiple projects. So that is in essence what North Carolina is discussing when it discusses a rule clarification. And with respect to the three reasons that But is there an indication here this policy was applied in two different ways in this instance here? I mean, is there any from North Carolina's perspective? From my perspective, I understand it was applied pretty solidly, which is why BEPCO was able to just come in and aggregate its projects in that manner and then get the benefit of the rule, whereas now perhaps it couldn't do so. So I don't know how you say, well, the facts in another case are the facts in this case. Because, Your Honor, the FERC adjudication applies retroactively. The case that North Carolina submitted to this court yesterday Yes, Your Honor. Looks as my time is up. Thank you very much. You have some time reserved for rebuttal. Thank you. Good morning, Your Honors. Lona Perry for the Federal Energy Regulatory Commission. I would like to begin with the issue that was just being discussed about whether or And the commission clearly found in the rehearing order in this case, in paragraph 12, Joint Appendix 965, that the incentives order had been issued consistent with what was the clear practice at that time of being able to look at projects individually and in the aggregate. I guess there's no indication that the first policy there was something wrong with it. That's right, Your Honor. But just help me to understand this. I'm not an expert in this area in terms of utilities. But as I understand, there were 11 projects. That's right, Your Honor. And VEPCOB submitted for incentives that were applied with some changes to be made in those 11 projects. I guess there were four and then seven. But the idea being is you really could have a couple of them not meeting it, but as long as they did so in the aggregate, that would satisfy. That is exactly the standard that was being applied, Your Honor. In the incentives order, the commission was applying the nexus Where would it end? Could you have 99 projects and two meet it and the other 97 would do it? Now, that's not their argument, but it seems to me if they were arguing retroactively, you would say there was something wrong with that law inherently, maybe from due process or some other type of basis of saying you can't do that. You can't just allow them to take in 97 projects because two of them meet it. That's not the intent of the law. That seems to me would be a substantive change in it to go there. But that doesn't seem to be the argument. But answer that if you will. But, Your Honor, they looked at the projects both individually and in the aggregate. That's key. Just Duncan brought that up. I think that's a very, very strong key point you make there. They did so. But they didn't. Or at least the problem that I have is you said that in the 2008 order, you say that those projects met the nexus test both individually and in the aggregate. And then you have this weird language in the order denying rehearing stating that the result, quote, may have been different, close quote, if it applied the 2010 policy regarding the nexus test. That introduces a fairly apparent discrepancy. You're at least suggesting that you didn't apply, as you had said you did, the nexus test individually and in the aggregate in 2008. So can you explain to me the discrepancy in its analysis that the FERC language itself introduces in its rehearing order? I don't believe that it's a discrepancy, Your Honor, because what the commission did in the incentives order was to look at the ‑‑ they looked at each project individually, and they said that they meet the nexus test individually and looking at it in the aggregate as they were allowed to do under the current practice at the time. In the 2012 rehearing order, the commission said we had this policy change in 2010. We said you can no longer, aggregate is no longer, you can't consider it any longer. You ought to emphasize here that there's a subordinate clause to that language. You said it can be argued. That's all it said, it can be argued. And then it goes on with that statement there. It seems like to me that takes care of it. It doesn't say they're saying it, it says it can be argued. That's right. Why don't you argue that? Well, what I was going to say, Your Honor, was when they make ‑‑ Well, why isn't that a good argument? Oh, no, it's an excellent argument. I think it's an excellent argument, Your Honor. I don't know why you don't make it. You're making all this, you're trying to explain how it might have, because that's not going to help you. But if you put that it can be argued, it sort of conditioned what they said. It sure could be argued. A lot of things could be argued. There's a subordinate clause to this, and I don't understand why that's not your argument. As much as I appreciate Judge Wynn's coaching explanation, I would like to hear yours. Well, my explanation is more along the why you aren't going that route. Not an explanation, not my explanation. Maybe I'm wrong on it. That's all. And I'm unclear what route you are going, because I haven't heard your explanation. Yeah, yeah. Yes, getting back to your explanation. In the 2012 rehearing order, the point I was going to make was the commission was saying we aren't applying this new policy, and so we aren't reaching the question of how this would apply in this circumstance. And I think that's all the commission was trying to say by that language, is just that we aren't addressing the question directly about how the 2010 policy would apply, because we are finding that we aren't going to apply it here for the reasons that have been addressed. And the commission isn't required to retroactively apply new policy. And as long as the commission gives a reasonable explanation for why it declines to do so in a particular case, then that is all that is required. And in this case, the commission gave a reasonable explanation for why it was declining, in this case, to apply the 2010 policy retroactively. Does it normally take – it took four years for the commission to issue its order denying rehearing? And I can't quite tell from the record why so much time elapsed between the two orders. Is that standard? No, Your Honor. This is – it would certainly be considered an outlier, I would think. But you have to recall that at the time, 679 was issued in response to the – to Congress's requirement that the commission issue a rulemaking that would impose this new incentive program. And so the commission issued 679, and as it gained experience with how its incentive program was working, there was an evolving policy changes to take into account the experience that it was having. So it's not usual to have four years, but then how do you use that then as one of the bases for saying, well, we're going to not apply it retroactively because BEPCO has relied on this and invested a lot. Part of the reason they've done it is because it took you four years to get to it. Yes, Your Honor. But there was an intervening policy change, and then there was the intervening consideration of whether the policy change should be applied retroactively or not. And, you know, in 2010, two years later, there was a policy change, and then the commission had to consider whether in those kinds of incentive cases that had been pending all this time whether they should be applying that policy retroactively or not. It does get back to your jurisdictional bar argument, though, doesn't it? You fault the commission for not raising – making their argument earlier, but part of the reason they couldn't is that they filed a petition for rehearing before your policy change. There was so much intervening time. That is correct, Your Honor, but the point is that when the commission looked at the 2010 policy and the 2012 rehearing order and decided not to apply it, that was a new ruling that had never been made before, an issue that had never been addressed. And at that point, that's when the obligation – because the point – the court recognized in Williams and in other cases part of the point of the rehearing requirement is so that the commission gets the opportunity in the first instance to hear the petitioner's complaints and to address them. Which court was that in Williams? It's the – it's the D.C. Circuit, 3F3rd. And what is the effect of the D.C. Circuit Law here? There are statutory concerns in terms of the times it's binding and not. Is this one of those instances? No, Your Honor. I mean, it's – In other words, is the D.C. Circuit Law binding on us? No, no, Your Honor. It's not. It isn't. But that was just – But isn't there a statute that basically says in certain agency-type cases that law is binding? That's why they keep saying it's one of the most powerful courts in the country because those cases go to it and it's binding. But this is not one of those – this D.C. Circuit Law is not binding on us is what you're telling me. No, Your Honor. It wouldn't be. But this court has authority which gets you to the same place. For example, the National Posters case, 720 Fed 2nd at 1363, is a case in an adjudication just like this one where a new rule was applied and the court found that the commission has discretion to decide if retroactivity best effectuates the statutory goals. And that it's up to the agency's discretion to make that determination. And that's essentially what happened here with respect to the 2010 policy is that the commission exercised its discretion not to apply that retroactively because of the prejudice to VEPCO, because of the time delay. But I also want to point out that it wasn't just the prejudice to VEPCO, but it was also the prejudice to future developers, whether people were going to question the availability of incentives or whether if they got incentives awarded in the first instance they would be later taken away. And that is also an uncertainty and confusion point the commission was making. Right. But my question with respect to the delay, that four-year delay, was leading back to your argument that the North Carolina Commission is jurisdictionally barred from raising the issue because it didn't do so in its petition for rehearing. Right, Your Honor. But the point would be that what was required in that instance was that they file a new petition for rehearing. I understand that they couldn't have done it in their original one because it didn't exist at that time. Right. And what is, I don't read Section 8251 quite that broadly. Presumably they could have relied on the fact that you would act with some degree of expeditiousness in resolving the first petition for rehearing and come forward with the explanation that you ultimately did. But it does appear in your argument with respect to jurisdictional bar that FERC bears a fair amount of the responsibility for that because of the delay. But, Your Honor, the fundamental point is that the rehearing requirement exists so that the commission has, in the instance, the first opportunity to address objections to its orders. Absolutely. And the reason that we're discussing it is it can't come into play, as you acknowledge, because the petition was filed before the 2010 policy change. Yes, Your Honor, but it is the point that was made, for example, in the town of Norwood case, 906 Fed 2nd 775, that if the rehearing order itself modifies the original order in some significant way, raising objections that are substantially different to the objections that were originally raised, a new requirement to file a request for rehearing arises. So when was the rehearing order issued? In 2012. So that wouldn't have helped either. What they should have done, I would say, is, as the petitioner did in Consolidated Edison, once there was a rehearing order issued that declined to apply a new policy to that case, they file a new request for rehearing. Well, I have to say that that's not entirely clear to me from the reading of 82. So I think maybe the Commission was not alone in not recognizing the need for them to file another petition for rehearing, arguing a ground that they could have argued had there been a timely adjudication of the first one. Your Honor, it's a jurisdictional requirement that they file for rehearing unless it is something that the Court considers to be a reasonable cause for not seeking, but it undermines the purpose of the rehearing requirement, which is to allow the Commission in the first instance to try to correct its own errors based on the arguments. But the argument says there's no request for rehearing is necessary where the rehearing order does not change the result. How do you respond to that? Because the result, Your Honor, I would say, is different in the sense that it is the first time, the very first time, that the Commission ruled that the 2010 policy did not apply to this case. That was never an issue and was never a holding before, and I would say that is a new ruling that then required a petition for rehearing to challenge that new ruling and to advise the Commission of the error in that ruling. Do you have any authority for the proposition that 8251's limitation applies to FERC decisions regarding what policy to apply in a given case? Well, Your Honor, the rehearing requirement applies to, I mean, there's no subject matter limitation on the rehearing requirement. If you have any objection to the FERC order, you are required jurisdictionally to assert it on rehearing, and it's only if you have reasonable cause not to do so that you're excused from that requirement, but there's no subject matter limitation on that requirement. I mean, any objection you have to the FERC order of whatever sort, mathematical, statutory, you know, whatever. But reasonable cost could certainly include undue delay.  And it undermines the purpose of the rehearing requirement to excuse it on that basis because the Commission is then given no opportunity to address objections to its findings. Although if the finding is because of undue delay, then that ultimately were down to FERC. Yes, Your Honor, I mean, four years, you know, the two years until the policy changed and then the two years until rehearing was significantly longer than it customarily would take. Before you run out of time, I want to switch gears and ask you about the transformer replacement project. FERC clearly mischaracterized the scope of that project in the order, so why wouldn't that necessitate a remand with respect to that project? But, Your Honor, the Commission, all the Commission's language was doing was just mimicking what was in Dominion's application materials. But the Commission clearly… Dominion made a motion to supplement and correct the record in that regard well prior to the order, four years prior to the order. Yes, Your Honor, but the Commission clearly did not misunderstand the scope of the project. I mean, it understood that it was $110 million. It understood the length of time it was going to take. It understood the seriousness of it. And $110 million, that simply isn't replacing nine transformers. I mean, it's a much bigger project than that. It's not that the Commission and the record evidences that they had reviewed the materials and the exhibits that had been put in the record by Dominion listed all of the transformers that were being replaced individually. So you're saying going from nine transformers to 32 transformers, it didn't change the $102 million it would have cost in the project? It was still going to be the same regardless? No, no, Your Honor. I'm saying that they knew it wasn't just nine transformers because a $110 million project is much too big for that. All that was missing was one word because it should have said nine transformer banks. It was nine transformer banks at seven substations. And the 32 transformers are spread out among those nine transformer banks. It's just that the word bank is missing. That's all. It means what? It means they are in the substation, the transformers are in banks. Multiple. Multiple. So nine banks. Banks makes a big difference, doesn't it? Yes, Your Honor, it does. But that's the only thing that's missing is the word banks. And the difference, the scope of the project clearly indicated it was bigger than just replacing nine individual transformers. And the word banks, in the banks there were multiple transformers. And that was exactly the reason for the project. Indeed, that was the justification for the project was because there were these banks of transformers that had similar vintages but there was only one spare for each bank, that there was a much higher risk of failure that the one spare couldn't mitigate. And that was the very purpose, the rationale for the program was exactly that, that there were banks of transformers with one spare where you might expect multiple failures because they were of similar vintages. And that's the proactive part of the program. So it's the very rationale of the program was turning on the fact that these were banks of transformers and not that were being replaced and not individual transformers. Could I ask a question about zone of reasonableness? If an applicant shows that the incentive rates fall within that zone of reasonableness, is that enough to meet prong three of the orders test? It wasn't quite clear to me. I'm sorry. Let me see if I can clarify this, Your Honor. The one thing to bear in mind is that this is a proceeding just to determine whether these projects are eligible for incentive rates. And when the commission looks at that, this is a determination. Ordinarily return on equity is not determined until the project is finished and it's fully constructed and the commission said for purposes of incentives, that's not very good for incentives if you don't give somebody an incentive until they're finished. Right. So they have this upfront procedure whereby the commission makes an initial determination of eligibility for incentives. Now, in that initial determination, the commission does look at, for purposes of just and reasonableness, it does look at whether it falls within the zone of reasonableness under the discounted cash flow analysis. But that doesn't mean that that's the only just and reasonable consideration that goes on. And that is best exemplified by what is going on right now before the commission with regard to the Garrisonville and the Pleasant View projects. Once Dominion wants to recover the actual costs of these projects and the incentive rates and an actual rate charged. When it's actually incorporated into rate. That's right, Your Honor. At that point, parties are allowed to raise, as the North Carolina Utilities Commission did, the question of whether or not the rates are just and reasonable. And they challenge the costs of undergrounding these projects. And that issue is pending before the commission right now. I'm sorry, but if I could just finish. No, please finish. Although I think I understand it makes perfect sense if you look at it temporarily, that just and reasonable is a term of art that usually comes into play when these expenses go into rates. But right now, what you're doing is projecting. Exactly, exactly. Thank you. Your Honor, with respect to the proactive transformer replacement project, the only word, FERC counsel stated that the only word missing from the order was bank. That's incorrect. Actually, they also stated that this money did not go to any spares. And what they did was replace 27 in-service transformers and five spares. So that's another example of where FERC did not address and ignored many of North Carolina's arguments in the 2008 order as well as the 2012 order. And so at a minimum, this court should remand back to FERC to have FERC address all of North Carolina's arguments. Even if the record shows that the FERC seems to clearly understood what the scope of that project was? Your Honor. It shows that banks is all through the record. If you look at the audit itself, aren't we allowed to look at what the evidence that was before? Yes, Your Honor. But the argument with respect to remanding back down to FERC is that they did not address North Carolina's arguments with respect to economic efficiency. In their order, they summarily addressed incorrectly the scope of the project of the proactive transformer replacement project and ignored North Carolina's arguments about economic efficiency, which violates a basic tenet of administrative law, which is set forth in the Norham case. It's N-O-R-H-M. But economic efficiency is not part of the three-prong test. It's part of the Federal Power Act, Section 219. It's within the language of the act that these incentives are to promote economically efficient transmission. And that's the issue. And Rule 679 states that there has to be a balancing test between investors and consumer interest. And in this case, FERC did not take into account the consumer's interest when it did not retroactively apply the change in the nexus case. But isn't that a slightly different point? And my recollection is that BEPCO did provide an exhibit that explained why proactive replacement of the transformers was prudent. Actually, Your Honor, if you look at the PRA test that PJM assessed, within the last part of the PRA test, PJM stated that it was not economically efficient to even have the number of spares that BEPCO had. BEPCO had 18 spares at the time. PJM stated that they only needed 11 spares, so Dominion or BEPCO had extra spares. But there is a BEPCO exhibit that looked at the age of the targeted transformers and decided that replacement was prudent. And if there is a dispute, if there is any kind of inconsistency in the evidence, that simply goes to FERC's ability to make those assessments in the first place. And all we look for is whether there's substantial evidence in the record to support it. Your Honor, 219 requires economically efficient transmission, and we're talking about incentives, not the base project. Local rate payers could bear the cost of the proactive transformer replacement projects, but when you're speaking of adding incentives, and this is 1.5 percent over the life of these transformers that can be for the next 30 years. There does seem to be a dispute. PJM, what PJM found appears to be fairly clearly rebutted by the testimony, I think it's Bobby McGuire, BEPCO's expert in follow-up analysis. So what you're telling us is that there appears to be a dispute or there's some conflict in the evidence, but FERC sits to evaluate that in the first instance. Correct, Your Honor. However, North Carolina believes that the evidence shows that it was a non-economic project, and since it was a non-economic project, it failed the test to meet the granting of incentives. One last point I'd like to make is Quest versus the FCC. This is a case that stated that FERC does need to apply the nexus test on a retroactive basis unless they can prove manifest injustice, which FERC did not prove because BEPCO did not rely on the old law. And in closing, North Carolina requests that this court remand this case to FERC, instructing FERC to engage and respond to all of North Carolina's arguments and apply the nexus test individually to each of the five projects individually per the 2010 FERC adjudications in PJM and the Oklahoma Gas and Electric case. And it seems I have a few more minutes. Actually, you do not. Or at least your red light is on from our side. Thank you. Good try. Thank you. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, James A. Wynn Jr., Stephanie D. Thacker